IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Consolidated Insured Benefits, Inc., and Ronald R. English, | ) | C.A. NO. 6:03-cv-03211-RBH |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **and ORDER** |
| Conseco Medical Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the court are Defendant Conseco Medical Insurance Company's Motion for

Summary Judgment and *Daubert* Motion to Exclude Testimony of Plaintiffs' Expert, Dr. Charles

Alford.  A hearing was held on these motions on November 6, 2006.  On November 16, 2006, the

parties filed a Joint Stipulation dismissing with prejudice the claims of Plaintiff Ronald English.

### **Alleged Background Facts[1] and Procedural History**

Plaintiff Consolidated Insured Benefits, Inc. ("CIB") is an insurance brokerage agency,

founded by James English, that markets and distributes insurance products and services in North

Carolina and South Carolina for various insurance carriers.  Defendant Conseco Medical Insurance

Company ("Conseco Medical") is one of the insurance carriers for whom CIB marketed and

distributed insurance products.

Since 1995, CIB has primarily been involved in marketing and distributing individual major

medical insurance policies.  CIB distributed these policies for several national health insurance

companies, including Washington National Insurance Company of Lincolnshire, Illinois.  CIB and

---

[1] The facts as presented in this Order are stated in a light most favorable to the non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Ronald English were appointed by Washington National as a Field Marketing Organization ("FMO"). Under the FMO agreement, CIB and Ronald English were entitled to first year and renewal commissions on Washington National medical insurance policies sold by CIB's insurance agents.

In 1997, Washington National was acquired by Connecticut National Life Insurance Company. In 1998, Conseco, Inc. acquired Connecticut National and changed Connecticut National's name to Conseco Medical Insurance Company. CIB's blocks of Washington National/ Connecticut National health insurance policies and the FMO agreement were transferred to Conseco Medical Insurance Company.

In August of 1998, CIB attended the Conseco FMO Annual Conference in San Diego, California. At the conference, CIB was informed of new provisions in the FMO agreement with Conseco Medical. Specifically, CIB claims it was told that the new FMO agreements would require them to: 1) distribute only Conseco Medical's individual major medical policies; 2) establish Conseco Medical as their primary health insurance carrier; 3) enter into an exclusive sales and distribution relationship with Conseco Medical for all its individual major medical insurance business; 4) recontract their subagents with Conseco Medical; and 5) stop recruiting brokers for or promoting new sales with any competing company with which it held contracts. During the conference, CIB met with, Jon Eastman, Senior Vice President of Sales and Marketing for Conseco Major Medical Division, to discuss the new FMO agreement. When CIB expressed concern about moving all of their block of business to Conseco Medical, and cited the risk to CIB if Conseco got into financial trouble, Eastman referred to a marketing partnership relationship and emphasized that the partnership would ensure a sharing of information, and that the books would be open.

2

In late January 1999, CIB and Ronald English executed a Sales Representative Agreement with an addendum entitled Field Marketing Organization Guidelines. The relevant provisions of the Sales Representative Agreement state:

> Entire Agreement and Prior Agreements
>
> This Agreement is the sole and entire agreement between the parties. Any understandings, negotiations, representations, statements, promises, and agreements, oral or otherwise, not included in this Agreement shall have no force and effect in the construction of the rights and obligations of the parties...
>
> Territory and Assignment
>
> ...The Company reserves the right at any time to withdraw from any territory, and to discontinue or withdraw or amend any Policies used in a territory without prejudice to its right to operate in any other territory.
>
> Relationship
>
> This Agreement shall not be construed to create the relationship of employer and employee between the Company and you. You are and shall be considered an independent contractor. You shall be free to exercise independent judgment as to the time and place of performing all acts authorized under this Agreement...
>
> Termination
>
> ...Either party may terminate this Agreement by giving written notice to the other party at least thirty (30) days prior to such termination date...

Under the Sales Representative Agreement with the Field Marketing Organization Guidelines Addendum, CIB was required to: 1) give Conseco Medical the right of first refusal on all individual major medical insurance policy applications; 2) cease actively selling policies and recruiting agents for other major medical insurance carriers; and 3) begin marketing and  distributing major medical

3

policies exclusively for Conseco Medical.  Conseco Medical  referred to its relationship with CIB as a "Marketing Partnership."  The "marketing partnership" entitled CIB  to the highest level of commission offered from Conseco Medical and made CIB eligible for bonuses.

In the Spring of 2000, Conseco Medical's parent company, Conseco, Inc., began experiencing financial difficulty, which resulted in its bond rating being downgraded.  Because a large concentration of CIB's business was with Conseco Medical, this adverse financial news caused great concern to CIB, who began a continuing dialogue with Conseco Medical's management regarding Conseco's financial condition.

During this time, Timothy O'Keefe was the President of the Conseco Major Medical Division and the senior operations person for Conseco Medical.  When CIB questioned O'Keefe about the financial condition of Conseco Medical, O'Keefe told CIB that Conseco Medical was financially sound and that their concerns were unfounded.

On June 15, 2000, Conseco, Inc.'s interim CEO issued a press release, which was forwarded to CIB, stating that "Conseco's insurance subsidiaries continue to be financially strong . . .[our] insurance and fee-based businesses will provide the foundation for Conseco's future."  The following day, Jon Eastman sent a letter to Conseco Medical producers,  including CIB, regarding the financial condition of Conseco Medical.  Eastman emphasized that the Conseco group of insurance companies "enjoys a very strong financial position."  Eastman stated that "Conseco Medical is financially sound and solvent, and we look forward to continuing work with our marketing partners to help you meet your clients' major medical insurance needs."  Eastman also stated that Conseco's plan to address the financial difficulties was to sell Conseco Finance and other non-core assets, such as an interest in a riverboat casino.

The May/June 2000 issue of Field, the Conseco Medical marketing newsletter, expanded upon the future of the FMO partnership, and emphasized a commitment to the long-term future of the marketing partnership. Eastman was quoted as specifically reaffirming Conseco Medical's commitment to the individual major medical business as a core business:

> Conseco Medical's past success is a direct result of our partnership with FMOs – and the marketing partnership is instrumental to our future success . . . I am very excited about Conseco's decision to redirect its focus on its core insurance operations. I am confident that together with our marketing partners, we will achieve a higher level of success than ever before . . . In recent months, Conseco Medical has taken steps to focus and concentrate on our core business – individual major medical insurance. . .

CIB alleges that within two months these representations were no longer true. In June of 2000, Gary Wendt was hired as Conseco, Inc.'s CEO. By July 2000, according to an August 9, 2001 news article in *BestWire*, a plan to exit the major medical insurance business in certain states had been adopted because of increasing claims problems and operational losses.

On August 24-27, 2000, CIB attended the 2000 Conseco Medical FMO Marketing Partnership Sales Conference in Lake Geneva, Wisconsin. The September/October 2000 FieldFocus Newsletter summarized the conference in an article entitled "A New Level of Partnership." According to the article, the conference marked "a new level of partnership" between Conseco Medical and its FMOs. Illustrating this point, the article noted that "[c]onfidential information was exchanged. Privileged strategic plans were shared. FMOs were invited into the very heart of the organization." The newsletter quoted Jon Eastman saying "[w]e opened the books to FMOs . . . We'd never shared this level of information before. If we truly have a partnership, then the FMO needs to know what we know. . .We did it to maintain the FMO platform into the future." The

newsletter also purported to disclose the Conseco Medical Major Medical Action Plan for the future; no mention was  made in the Plan of the decision to sell the company or its major medical block of business.  CIB contends that these representations were knowingly false in light of the decision to sell the company; false because it misrepresented the  real action plan for the company, and misleading because it failed to disclose the decision to sell.

According to the evidence submitted by CIB, the plan to exit the major medical business had been adopted by Conseco at least by the end of July, 2000.  Also prior to the conference, CIB alleges that Conseco had retained an investment bank to help it find a buyer for all or a majority of the company's business, securities, or assets.  Allegedly, O'Keefe was told to keep the meeting with the investment bank confidential.

On August 30, 2000, O'Keefe wrote to Louis A. Farris, Jr., Chairman of Empire Financial Corporation, a company which was apparently interested in purchasing Conseco Medical, forwarding "additional information for your review" on the Conseco Major Medical Division.  CIB contends that O'Keefe appears to have known of the decision to exit the business, and was involved in efforts to sell Conseco Medical, before the conference began.  Allegedly, the decision to sell Conseco Medical, the retention of an investment banking advisor, and the contact with Empire were not disclosed to CIB at the FMO conference, or at any time before March of 2001.

CIB alleges that during the conference, James English told O'Keefe that the exclusivity requirement in the FMO guidelines resulted in a concentration of most of CIB's individual major medical business in Conseco Medical, thus causing CIB to lose its marketing contracts with other individual major medical companies.  James English emphasized to Conseco Medical the catastrophic impact a Conseco Medical failure would have upon CIB's block of business.  English

6

also emphasized his inability to replace the coverage and preserve CIB's income stream without *significant advance notice* of any changes at Conseco Medical.  CIB further alleges that in response, O'Keefe and Eastman represented to CIB that Conseco Medical was financially sound, and that Conseco Medical was taking steps to ensure its continued success by locating an investment partner or reinsurer.  O'Keefe and Eastman repeatedly stated, falsely according to CIB, that Conseco Medical was committed to the FMO Partnership.

CIB argues that its evidence indicates that Conseco Medical concealed and did not disclose that it was actively involved in an effort to sell the company, had engaged an investment bank to find a buyer, and had opened detailed discussions with one specific potential purchaser, Empire Financial, before the conference began.  Evidence was also submitted that O'Keefe knew of the decision to exit the business, and was involved in efforts to sell Conseco Medical, before the conference began.

In the September 30, 2000 Quarterly Report for Conseco, Inc. that was submitted to  the Securities and Exchange Commission, Conseco disclosed that it intended to sell its individual major medical insurance line.  CIB contends that it was not aware of these public filings.

In a letter dated January 10, 2001, Eastman wrote to James English representing that 2000 had been Conseco Medical's "best year ever."  CIB contends that statement was false,  as Conseco Medical had statutory losses of over $76,000,000 in 2000.  Eastman's letter also stated that "[w]e look forward to . . . providing you a sneak preview of our new sales and marketing plans for 2001 and beyond."  No mention of a plan to sell Conseco Medical was made.

On or about February 9, 2001, Conseco Medical sent CIB and Ronald English new FMO contract documents for 2001 with a letter from Eastman.  The letter from Eastman represented that

7

Conseco Medical had "just completed the most successful and productive year in the history of the Field Marketing Organization - FMO."  However, the defendant's accounting expert testified at his deposition that Conseco Medical had a loss from operations in 2000 of $80,125,000, and in 2001 of $95,017,000.  Eastman's letter also stated that Conseco Medical's "commitment to the FMO Marketing Partnership continues to grow  stronger every day.  In the coming months we will be introducing several major marketing initiatives, transition initiatives, and FMO support programs, which will position us as an industry leader in the Major Medical and financial services business." CIB alleges that these representations were false and misleading when in fact a decision had already been made to exit the major medical business.  Ronald English testified at his deposition that "[t]hey were not telling us the truth.  They were representing to us that they were in when they had made decisions that they were not – that they were out."

Allegedly while relying on Conseco Medical's representations that the company was financially sound, that its effort to find an investment partner or reinsurer were all done "but the signature," and that the CIB block of major medical business would be protected, CIB executed the 2001 FMO contract documents.

By March 7, 2001, a proposed purchase agreement had been drafted that provided for the purchase of the stock of Conseco Medical by Empire Capital Corporation.  It was around this time that Conseco Medical informed CIB that a decision had been made to sell the company. Allegedly, O'Keefe and Eastman assured CIB that any sale of Conseco Medical would have no impact on the FMO distribution system or CIB's block of business, which was being protected  in any discussions regarding a sale of the company.  CIB maintains that it was not told of any decision to sell Conseco Medical before March 2001.

The Conseco Medical Winner's Circle Cruise Conference took place April 27 - May 4, 2001. O'Keefe and Eastman, as well as leading FMOs, including James and Ronald English, attended. Prior to this conference, the Conseco Medical actuarial staff had been instructed to analyze the financial aspects of a total shutdown of the major medical business by December 31, 2001. Conseco actuary Fran Jones prepared the spread sheet and forwarded it to the Conseco Medical Executive offices in Rockford, Illinois on April 26, 2001. Conseco Medical did not disclose to CIB that it had begun analyzing a complete non-renewal or cancellation of the block of business. To the contrary, Eastman allegedly told CIB that the individual major medical business would be on-going and unchanged. In addition, O'Keefe addressed the spouses of the FMOs in attendance at a special meeting to convey the message that everything was sound, that the FMOs were going to continue to do the same jobs, that the marketing partnership was sound, and that the business would continue exactly as it was.

From mid-April, until late June 2001, CIB alleges that Conseco Medical's management actively considered non-renewing the bulk of the company's block of individual major medical policies, including all such in-force policies in North and South Carolina. By May 17, 2001, other statutory projections for a total shutdown of the individual major medical business were prepared for Conseco Medical and circulated internally. By May 24, the Empire deal to sell Conseco Medical had all but fallen through and there was no interest from any other buyer. A third Statutory Projection for Major Medical Shut Down was prepared for Conseco Medical and circulated internally on June 8, 2001. By this time, non-renewal of the major medical insurance policies was the leading option.

On June 22, Conseco Medical circulated internally a memorandum outlining options

9

for non-renewing the major medical business.  The memorandum made it clear that the decision had been made to exit the Conseco Medical major medical business in some states; only a final selection of the states to be cancelled remained. The memorandum included a <u>Loss Mitigation Plan</u> to "identify and partner with a Major Medical carrier who will rewrite business onto their current policy form in the states we exit CMIC."  Rewrite was important because the non-renewal of major medical policies increases claims and cancellations, while at the same time increasing expense and decreasing premium income.

Allegedly, notes of a June 27, 2001 meeting between O'Keefe, Wolfram, and Mike Borom, a senior Conseco, Inc. consultant, fairly reveal that a decision was made at that time to exit the major medical business in 21 states, including North and South Carolina.  FMO's were not told of that decision.  Cancellation letters were to be prepared to be sent no later than July 31, 2001, regardless of whether a rewrite carrier had been found.  Notice to state Departments of Insurance was scheduled for July 18, 2001, with non-renewal letters to policyholders scheduled for July 23, 2001.  Allegedly, there was opposition to giving the FMOs even a few days notice unless a rewrite carrier was in place because they might replace the business with another carrier.  CIB was not informed of the decision to non-renew the North and South Carolina policies until July 20, 2001, three days before the non-renewal letters to the policyholders were sent.

According to CIB, Conseco Medical's non-renewal of coverage in North and South Carolina resulted in the cancellation of 90% of the health insurance policies CIB had caused to be issued through its broker field force of agents.  Further, CIB contends that Conseco Medical's last minute notice of the non-renewal of the block of business, deprived it of any meaningful ability to offer replacement coverage to its policyholders or agents, and thus to preserve its commission base.

10

As a result, CIB alleges that it lost 90% of its individual major medical book of business without compensation of any kind, and 90% of its annual commission income. In addition, CIB contends that it lost most of its health insurance agents, who blamed CIB for the lack of notice of non-renewal and the loss of their individual major medical business as well.

CIB and Ronald English filed suit in the United States District Court for the District of South Carolina on October 8, 2003, alleging fraud, negligent misrepresentation, and breach of fiduciary duty. Specifically, CIB alleges that Conseco Medical fraudulently induced CIB to continue to act as an exclusive distributor of Conseco Medical's individual major medical policies in North and South Carolina. According to CIB, Conseco Medical defrauded CIB from August 2000 until July 2001 so that Conseco Medical could avoid losing its policy holders and FMOs to competitor insurance companies, thereby preserving a valuable asset, the stream of income from policy premiums. CIB does not allege that Conseco Medical's non-renewal of its individual major medical block of policies constituted a breach of contract. Rather, CIB contends that during the period of July 2000 through July 2001, Conseco Medical misrepresented a series of material facts regarding its commitment to the FMO partnership and its major medical insurance block of business, and withheld from the FMOs material information regarding its effort to divest the individual major medical insurance block. These facts include a decision by Conseco Medical and its parent in the summer of 2000 to sell the company or its major medical block; planning beginning in April 2001 to completely non-renew the block of business; and a decision by Conseco Medical in June of 2001 to do so. CIB contends that the fraud took the form of affirmative false statements regarding these events, and the concealment or non-disclosure of material information in the face of a duty of disclosure.

**Defendant Conseco Medical Insurance Company's Motion for Summary Judgment**

Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

Fraud

CIB has alleged Conseco Medical committed fraud by affirmative misrepresentation and fraud by non-disclosure.  The elements of fraud must be shown by clear, cogent and convincing evidence. *Outlaw v. Calhoun Life Ins. Co.*, 119 S.E.2d 685, 686 (S.C. 1961).  Under South Carolina law, the elements of actual fraud based on affirmative misrepresentation are:

> (1) misrepresentations of a material fact; (2) made with knowledge of its falsity or ignorance of its truth; (3) intended by the maker to induce action in reliance; (4) lack of knowledge by the other that the fact represented is false; (5) reasonable reliance by the other upon the fact; and (6) harm proximately caused by the reliance.

*Starkey v. Bell*, 315 S.E.2d 153, 155 (S.C. Ct. App. 1984); *M. B. Kahn Constr. Co., Inc. v. South Carolina Nat'l Bank of Charleston*, 271 S.E.2d 414, 415 (S.C. 1980).  Viewing the evidence in a light most favorable to CIB, genuine issues of material fact exist as to each element of fraud by affirmative misrepresentation.

There is evidence in the record from which a jury could reasonably conclude that from July 2000 until March 2001, Conseco Medical made repeated misrepresentations of material fact to CIB.  Specifically, a jury could reasonably conclude that Conseco Medical made material misrepresentations regarding its financial condition, its commitment to the major medical insurance market, and its commitment to the FMO marketing partnership.

A misrepresentation is material when it induces a person to act. *See Sub Station II of Tennessee, Inc. v. Oliver*, 414 S.E.2d 141, 142 (S.C. 1992); *Finley v. Dalton*, 164 S.E.2d 763, 765-66 (S.C. 1968); *Culbreath v. Investors Syndicate*, 26 S.E.2d 809, 812 (S.C. 1943).  CIB contends that truthful statements with regard to Conseco Medical's financial condition and commitment to both the major medical insurance market and the FMOs would have been

extremely important to its decision to continue and renew its exclusive contract with Conseco Medical in February 2001. As noted above, CIB alleges that Conseco Medical fraudulently induced CIB to continue to act as an exclusive distributor of Conseco Medical's individual major medical insurance policies in North and South Carolina. CIB also contends that it would have taken steps to protect its book of business with other major medical insurance companies.

Conseco Medical argues that all of the representations that were made to CIB were true when made. However, the record contains evidence from which a jury could reasonably conclude that Conseco Medical and its executives knew that their representations were false when made. O'Keefe and Eastman admitted at their depositions that they learned of the Conseco plan to exit the major medical business in August of 2000. Additionally, the article that appeared in *BestWire* in August 2001 stated that a plan to exit the major medical insurance business in certain states had been adopted more than one year earlier because of increasing claims problems and operational losses. Yet, O'Keefe and Eastman continued to represent to CIB that Conseco Medical was financially sound and committed to the major medical insurance business and its FMO marketing partnership.

Likewise, there is sufficient evidence at this stage that CIB relied on Conseco Medical's representations. CIB was obviously aware of the risk to their business if Conseco Medical failed financially. Yet, allegedly CIB maintained their exclusive FMO contract with Conseco Medical as a result of Conseco Medical's alleged misrepresentations.

Conseco Medical argues that CIB could not have reasonably relied on Conseco Medical's alleged misrepresentations as to the company's financial condition or commitment to the major medical insurance business and the FMOs for two reasons.

14

First, Conseco Medical argues that CIB's reliance is unreasonable because everything Conseco Medical did was authorized under its contract with CIB. Specifically, Conseco Medical argues that the Sales Representative Agreement allows Conseco Medical: 1) to withdraw from any territory with no notice; and 2) to terminate its contract with CIB with thirty (30) days notice. In light of these contractual provisions, Conseco Medical argues that any reliance on statements that indicated that Conseco Medical would remain in the major medical insurance business in North and South Carolina was unreasonable.

Second, Conseco Medical argues that its Securities and Exchange Commission filings, which purportedly disclose its intention to sell its major medical block of business, preclude CIB from reasonably relying on any representations regarding Conseco Medical's commitment to the major medical insurance business or the FMO marketing partnership.

"The general rule is that questions concerning reliance and its reasonableness are factual questions for the jury." *Unlimited Services, Inc. v. Macklen Enterprises, Inc.*, 401 S.E.2d 153, 155 (S.C. 1991); *Starkey*, 315 S.E.2d at 156 (stating "[i]ssues of reliance and its reasonableness, going as they do to subjective states of mind and applications of objective standards of reasonableness, are preeminently factual issues for the triers of the facts"). "Whether reliance is justified in a given situation requires an evaluation of the circumstances involved, including the positions and relations of the parties." *Elders v. Parker*, 332 S.E.2d 563, 567 (S.C. Ct. App. 1985). The recipient of a fraudulent misrepresentation of fact *may be* justified in relying upon its truth, although he might have discovered the falsity of the representation had he made an investigation. *See Reid v. Harbison Development Corp.*, 330 S.E.2d 532, 534 (S.C. Ct. App.

15

1985) (citing Restatement (Second) of Torts, § 540 (1979)).[2]  "The person committing the fraud cannot defeat a claim for misrepresentation simply because the person defrauded is charged with notice under a recording statute." *Reid*, 330 S.E.2d at 534.  Additionally, the question of whether a plaintiff can reasonably rely on a misrepresentation in light of information on the public record is one of fact for a jury. *Slack v. James*, 589 S.E.2d 772, 774 (S.C. Ct. App. 2003), *aff'd*, 614 S.E.2d 636 (S.C. 2005).

In this case, there is evidence from which a reasonable jury could conclude that CIB's reliance on the alleged misrepresentations was reasonable.  The relationship between CIB and Conseco Medical, which was characterized by Conseco Medical as a "marketing partnership" where confidential information was exchanged and privileged strategic plans were shared, may render CIB's reliance on Conseco Medical's alleged misrepresentations reasonable in the minds of the jurors.  Considering statements by Conseco Medical in the nature of "[i]f we truly have a partnership, then the FMO needs to know what we know," a jury may conclude that CIB's reliance was reasonable even in light of the contractual provisions authorizing Conseco Medical's actions and the Securities and Exchange Commission filings.

CIB has also alleged Conseco Medical committed fraud by non-disclosure.  Normally, parties to a transaction do not owe a duty of disclosure to one another.  However, as noted in

---

[2] The South Carolina Supreme Court noted in *Slack v. James* that the Restatement (Second) of Torts § 540 was inconsistent with S.C. law to the extent that the Restatement suggests that a recipient of a fraudulent misrepresentation of fact is <u>always</u> justified in relying upon its truth and not conducting his own investigation. *See, e.g. Florentine Corp., Inc. v. PEDA I, Inc.*, 339 S.E.2d 112 (S.C. 1985) (determination of what constitutes reasonable diligence must be made on case by case basis); *Watts v. Monarch Builders., Inc.*, 252 S.E.2d 889 (S.C. 1979) (no evidence of fraud where buyers relied on seller's agent's representation about property lines instead of conducting their own investigation). *Slack v. James*, 614 S.E.2d 636, 639 n.2 (S.C. 2005).

*Jacobson v. Yaschik*, 155 S.E.2d 601, 605 (S.C. 1967), and *Manning v. Dial*, 245 S.E.2d 120,

122 (S.C. 1978), there are exceptions to this rule. Non-disclosure of a fact may be fraudulent if

the party withholding the information had a duty to speak. *Manning*, 245 S.E.2d at 122;

*Jacobson*, 155 S.E.2d at 605.

> The duty to disclose may be reduced to three distinct classes: (1)
> where it arises from a preexisting definite fiduciary relation between
> the parties; (2) where one party expressly reposes a trust and
> confidence in the other with reference to the particular transaction in
> question, or else from the circumstances of the case, the nature of their
> dealings, or their position towards each other, such a trust and
> confidence in the particular case is necessarily implied; (3) where the
> very contract or transaction itself, in its essential nature, is intrinsically
> fiduciary and necessarily calls for perfect good faith and full disclosure
> without regard to any particular intention of the parties.

*Ellie, Inc. v. Miccichi*, 594 S.E.2d 485, 497 (S.C. Ct. App. 2004). CIB contends that Conseco

Medical had a duty to disclose material information regarding the FMO marketing partnership

for three reasons. First, CIB argues that Conseco Medical had a duty to correct statements in a

business transaction that were true when made but have been rendered untrue by subsequent

events. Second, CIB argues that Conseco Medical owed a duty to disclose because Conseco

Medical intentionally created a relationship of trust and confidence with CIB. Third, CIB

argues that Conseco Medical owed a duty to disclose because a fiduciary relationship was

created between Conseco Medical and CIB.

"A duty of disclosure and due care can exist in economic transactions where no

fiduciary relationship exists." F. Patrick Hubbard & Robert L. Felix, *The South Carolina Law of

Torts* 72 (3d ed. 2004). In this case, Conseco Medical owed a duty of disclosure to CIB.

This duty to disclose arises from the facts and circumstances of the case and the nature of the

dealings between the parties. Conseco Medical repeatedly characterized its relationship with its

17

FMOs as a marketing partnership.  Conseco Medical also acknowledged that confidential information was exchanged between Conseco Medical and its FMOs.  Further characterizing the relationship, Eastman stated "[w]e opened the books to FMOs . . .We'd never shared this level of information before.  If we truly have a partnership, then the FMO needs to know what we know."  Although the relationship between CIB and Conseco Medical does not necessarily qualify as a fiduciary relationship or a legal partnership,[3] under the facts and circumstances of this case, the relationship was one in which trust and confidence was necessarily implied. Thus, Conseco Medical had a duty to disclose information regarding the future of the marketing partnership.

The court finds that there are genuine issues of material fact regarding CIB's claims of fraud by affirmative misrepresentation and fraud by non-disclosure.  Therefore, Conseco Medical's Motion for Summary Judgment as to CIB's claims of fraud by affirmative misrepresentation and fraud by non-disclosure is denied.

Negligent Misrepresentation

"To state a claim for negligent misrepresentation, the plaintiff must allege (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation." *ML-Lee Acquisition*

---

[3] At the hearing held on this motion, CIB's counsel conceded that the facts of this case do not support a finding of a "legal partnership" between the parties under S.C. law.

18

*Fund, L.P. v. Deloitte & Touche*, 463 S.E.2d 618, 624 (S.C. Ct. App. 1995), aff'd in part and rev'd in part, 489 S.E.2d 470 (S.C. 1997); *Fields v. Melrose Ltd. P'ship*, 439 S.E.2d 283, 285 (S.C. Ct. App. 1993). "The plaintiff must show that his reliance on the misrepresentation was reasonable." *Harrington v. Mikell*, 469 S.E.2d 627, 629 (S.C. Ct. App. 1996). The "key difference between fraud and negligent misrepresentation is that fraud requires the conveyance of a known falsity, while negligent misrepresentation is predicated upon transmission of a negligently made false statement." *Brown v. Stewart*, 557 S.E.2d 676, 681 (S.C. Ct. App. 2001). "A duty to exercise reasonable care in giving information exists when the defendant has a pecuniary interest in the transaction." *Winburn v. Insurance Co. of North America*, 339 S.E.2d 142, 146 (S.C. Ct. App. 1985).

As discussed above, there is sufficient evidence from which a reasonable jury may conclude that Conseco Medical made false representations to CIB. Conseco Medical made representations that it was committed to the marketing partnership and the FMOs. However, viewing the evidence in a light most favorable to CIB, it appears that Conseco Medical was not committed to the marketing partnership and the FMOs. Conseco Medical made representations that it was financially sound and producing record breaking earnings. However, Conseco Medical had an operational loss in the amount of $80,125,000 in 2000 and $95,017,000 in 2001.

There is evidence that Conseco Medical had a pecuniary interest in making the alleged statements. Conseco Medical benefitted financially by inducing, either intentionally or negligently, CIB to renew its FMO agreement in 2001. During the time Conseco Medical allegedly made false misrepresentations to CIB, from August 2000 until July 2001, Conseco

Medical was able to avoid losing its policy holders and FMOs to competitor insurance companies, thereby preserving a valuable asset, the stream of income from policy premiums.

As stated above, if the defendant has a pecuniary interest in the transaction, the defendant owes a duty of care to communicate truthful information to the plaintiff. *Winburn*, 339 S.E.2d at 146. In this case, Conseco Medical owed a duty of care to communicate truthful information to CIB regarding the future of the FMO marketing partnership. Conseco Medical's duty of care arises from Conseco Medical's pecuniary interest in its relationship with CIB. In addition to Conseco Medical's pecuniary interest, Conseco Medical repeatedly characterized its relationship with CIB and the other FMOs as a marketing partnership where confidential and privileged information was shared, i.e. "the FMO needs to know what we know."

A jury may reasonably conclude that Conseco Medical breached its duty to communicate truthful information regarding the future of the FMO. Conseco Medical allegedly represented that it was committed to the future of the FMO marketing partnership and that the company was financially sound. Viewing the evidence in a light most favorable to CIB, these representations could have been false at the time they were made. If a jury were to conclude that Conseco Medical made affirmative misrepresentations of material fact to CIB, the jury may also find that the misrepresentations were not made intentionally, but were made negligently.

The question of whether CIB's reliance on the alleged misrepresentations of Conseco Medical was reasonable is one for the jury. *See Slack*, 589 S.E.2d at 774; *Unlimited Services*, 401 S.E.2d at 155; *Starkey*, 315 S.E.2d at 156. CIB alleges that it was led to believe that it had a special "marketing partnership" with Conseco Medical that included the sharing of confidential and privileged information, where CIB would know everything Conseco Medical

20

knew.  Conseco Medical argues that CIB could not have justifiably relied on any alleged

misrepresentations because everything Conseco Medical did was authorized under their contract

and the intention to sell Conseco Medical was disclosed in the September 30, 2000 Quarterly

S.E.C. filing.  However, under these facts, a jury may conclude that CIB's reliance was

justifiable.

The Contractual Provision Dealing with Conseco Medical's Right to Non-Renew Its Block of
Major Medical Insurance Policies Does Not Immunize It From Liability for Fraud or Negligent
Misrepresentation

Conseco Medical first argues that it cannot be liable for fraud or negligent

misrepresentation because the decision to non-renew its policies in North and South Carolina was

permitted under the parties' sales representative agreement.  Conseco Medical's argument is

misdirected.  CIB does not complain that the non-renewal was actionable standing alone.  Conseco

Medical's non-renewal of its individual major medical policies in North and South Carolina is not

asserted as fraudulent or unlawful, or, as a breach of contract.  The sales representation agreements

specifically permit non-renewal by Conseco Medical, and CIB does not argue otherwise.  The

contracts do not, however, contain any provision that even purports to immunize Conseco Medical

from liability for alleged fraudulent conduct.

Conseco Medical's argument that everything they did was allowed under its contract and

therefore they could not be liable for fraud or negligent misrepresentation is not consistent with

South Carolina law.  "Even specific provisions or stipulations in a contract providing in effect for

immunity from or nullification or waiver of preliminary or extraneous misrepresentations in

connection with the contract are generally ineffective, and do not prevent a subsequent assertion of

the misrepresentations as a basis for fraud." *Allen-Parker Co. v. Lollis*, 185 S.E.2d 739, 742 (S.C.

1971).   Even the "as is" clause of a "contract does not constitute an absolute defense to an action

for fraud and deceit.   The inclusion of 'as is' clauses is usually an effort on the part of the seller

to assure application of the caveat emptor rule.   In *Lawson v. Citizens and Southern Nat. Bank of

S.C.*, 259 S.C. 477, 193 S.E.2d 124 (S.C. 1972), we said: ' . . . the doctrine of caveat emptor

does not apply in cases of fraud.'" *MacFarlane v. Manly*, 264 S.E.2d 838, 840 (S.C. 1980).

"Neither the parol evidence rule nor a merger clause in a contract prevents one from proceeding

on tort theories of negligent misrepresentation and fraud." *Slack v. James*, 614 S.E.2d 636, 640

(S.C. 2005).   "A party should not be given the opportunity to free himself from an allegation of

fraud by incorporating a generalized non-reliance clause into a contract." *Slack*, 614 S.E.2d at 641.

Conseco Medical also argues that the parties were engaged in an arms length transaction

and therefore no duty to disclose existed.   Conseco Medical cites a number of authorities that have

rejected the existence of a fiduciary or confidential relationship, and any duty of disclosure, where

the transactions in issue reflected a traditional arms-length relationship between the parties. *See R.

J. Clarkson Co., Inc. v. Jenn-Air Co.*, No. 95-1084, 1996 WL 228623, at *3 (4th Cir. May 7,

1996) (unpublished opinion) (sophisticated business partners dealing at arm's length); *Alexander v.

CIGNA Corp.*, 991 F. Supp. 427, 438 (D.N.J. 1998) (failure of plaintiff to present any evidence

that relationship was anything more than ordinary contractual relationship); *Pitts v. Jackson Nat'l

Life Ins. Co.*, 574 S.E.2d 502, 507-08 (S.C. Ct. App. 2002) (arms length relationship); *Agency

Dev. Inc. v. MedAmerica Ins. Co. of N.Y.*, 327 F. Supp. 2d 199 (W.D.N.Y. 2004); *Dodd Ins.

Serv., Inc. v. Royal Ins. Co. of America*, 935 F.2d 1152 (10th Cir. 1991).   The above-cited cases

are distinguishable from the facts of this case.   In this case there is evidence that the relationship

between CIB and Conseco Medical rose above the traditional arms length relationship that exists

22

between parties to a transaction.

Conseco Medical has also argued that the non-renewal provision of the Sales Representative Agreements, and the 30 day termination provision, operate to preclude any recovery of damages by CIB.  Relying upon *Shivers v. John H. Harland Co., Inc.*, 423 S.E.2d 105 (S.C. 1992), *Cade v. Conseco Health Ins. Co.*, 36 Fed. Appx. 122 (4th Cir. 2002) (unpublished), and *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247-48 (M.D. Fla. 2003), Conseco Medical argues that "there is no expectation of damages beyond the 30 day period," and that there can be no lost profits damages in the face of a 30 day termination provision or right to withdraw from the territory.  The difficulty with Conseco Medical's argument is that *Shivers*, *Cade*, and *AIG Life* are breach of contract cases, alleging wrongful termination of agency or employment agreements, and do not present tort claims.  As a result, the measure of damages applied in those cases, and here, is quite different.  *Shivers*, *Cade*, and *AIG Life* permit benefit of the bargain, breach of contract damages but limit them to the duration of the term of the contract, or deny lost profits damages.  No such limitation is imposed upon consequential damages suffered by a victim of tortious conduct.  Where prospective profits are prevented by the tortious conduct of a defendant, the plaintiff may recover upon proof that it is reasonably certain that such profits would have been realized except for the tort, and they can be calculated from the evidence produced with reasonable certainty. *Petty v. Weyerhaeuser Co.*, 342 S.E.2d 611, 615 (S.C. Ct. App. 1986).  Reasonable certainty means only that the damages may not be based on "speculation and conjecture."  *Petty*, 342 S.E.2d at 615.  Indeed, "[w]here the wrongful act of the defendant is of such a nature as to prevent determination of the exact amount of damages, the defendant is not allowed to insist on absolute certainty, but only that the evidence show the lost profits by reasonable inference." *Id*. at

23

616, quoting 22 Am. Jur. 2d *Damages* § 177 (1965).

Breach of Fiduciary Duty

The issue of whether CIB may proceed on a breach of fiduciary duty claim presents a closer question. CIB's breach of fiduciary duty claim is based on the proposition that Conseco Medical breached its fiduciary duty owed to CIB by: 1) misrepresenting material information regarding the marketing partnership and its future; 2) misrepresenting Conseco Medical's commitment to its major medical business; 3) concealing material information regarding its financial condition; 4) concealing the efforts to sell the company; and 5) concealing the planning and decision to non-renew until the last minute. CIB argues that the "marketing partnership" and the representations Conseco Medical made with regard to the sharing of confidential and privileged information create a fiduciary relationship. In defense of the breach of fiduciary duty claim, Conseco Medical argues that there is nothing which creates a fiduciary relationship between Conseco Medical and CIB. Specifically, Conseco Medical argues that there is no legal partnership between it and CIB and that their relationship was a business or arm's length transaction and no fiduciary relationship can exist out of an arm's length transaction. Additionally, as noted above, CIB agreed and conceded there was not a legal partnership between the parties, nor was the breach of fiduciary duty claim predicated on an alleged partnership. Rather, the breach of fiduciary duty claim was predicated on the alleged special trust and confidence that existed between the parties.

Under South Carolina law, "[a] confidential or fiduciary relationship exists when one imposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one imposing the confidence." *Brown v. Pearson*, 483 S.E.2d 477, 484 (S.C. Ct. App. 1997). "A fiduciary relationship cannot be

24

established by the unilateral action of one party.  The other party must have actually accepted or induced the confidence placed in him." *Steele v. Victory Sav. Bank*, 368 S.E.2d 91, 94 (S.C. Ct. App. 1988).  "Although whether a fiduciary relationship has been breached can be a question for the jury, the question of whether one should be imposed between two classes of people is a question for the court." *Hendricks v. Clemson University*, 578 S.E.2d 711, 715 (S.C. 2003).

It appears that no South Carolina Court has recognized a fiduciary duty in the insurer-independent insurance brokerage agency context and only a very few fiduciary relationships based on a "special confidence" (such as the one asserted by CIB) have been recognized:

> In South Carolina, "a confidential or fiduciary relationship exists when one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interest of the one reposing the confidence." Because the fiduciary duty is one which requires a high degree of care and consideration due the person to whom the duty is owed, only certain relationships carry with them this type of duty.  For example, lawyers owe a special duty to their clients.  The courts have also found special duties owed by real estate brokers to their clients, by partners to other partners, and by officers of a corporation to its shareholders. . .The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.

*Williams-Garrett v. Murphy*, 106 F. Supp. 2d 834, 840-41 (D.S.C. 2000).  South Carolina Courts have also found fiduciary relationships in the following situations: 1) an agent holding a power of attorney owes a fiduciary duty to his principal; 2) promoters of a corporation are fiduciaries to each other and the corporation; 3) bank and depositor may be in a fiduciary relationship where the bank undertakes to advise the depositor; and 4) employee is a fiduciary as to employer's funds. *See, e.g. Loftis v. Eck*, 341 S.E.2d 641 (S.C. Ct. App. 1986); *Duncan v. Brookview House, Inc.*, 205 S.E.2d

707 (S.C. 1974); *Rush v. South Carolina Nat'l Bank*, 343 S.E.2d 667 (S.C. Ct. App. 1986); *SSI*

*Medical Serv., Inc. v. Cox*, 392 S.E.2d 789 (S.C. 1990);

     South Carolina Courts have refused to find a fiduciary relationship in the following

situations: 1) the advisor - student relationship; 2) planned community board and residents; 3) bank

and depositor unless bank undertakes to advise; 4) insured and insurance company at the

application stage; and 5) middle-man and seller. *See, e.g. Hendricks*, 578 S.E.2d 711; *O'Shea v.*

*Lesser*, 416 S.E.2d 629 (S.C. 1992); *Regions Bank v. Schmauch*, 582 S.E.2d 432 (S.C. Ct. App.

2003); *Pitts,* 574 S.E.2d 502; *UNICO Dev. Servs., Inc. v. Oconee Geriatric, Inc.*, 409 S.E.2d 425

(S.C. Ct. App. 1991).

     The cases where a fiduciary relationship has been found by S.C. courts all have a similar

component.  In each case, the fiduciary is in either a position to advise or act solely on behalf of

the other party.  For example, lawyers and accountants are in positions to advise.  Real estate

agents or agents holding powers of attorney are in positions to act solely or exclusively on behalf

of the other party.  As a federal court sitting in diversity, it is not this court's function to expand

S.C. common law to impose a fiduciary duty on Conseco Medical on the facts of this case when

no S.C. court has previously recognized the existence of a fiduciary relationship on facts similar to

this case.  Here it is conceded that no partnership supported a breach of fiduciary duty.  Further, it

is undisputed that the terms of the contract between the parties provide that CIB was an

independent contractor for Conseco Medical.  What is in dispute is the effect that Conseco

Medical's representations as to the nature and character of the "marketing partnership" had on the

relationship. Conseco Medical's alleged representations as to the nature and character of the

"marketing partnership" may remove the relationship from classification as a traditional arms length

26

transaction; however, Conseco Medical's representations do not necessarily give rise to a fiduciary duty, which requires the highest degree of care and consideration from the individual owing the duty. *See, e.g. Redwend Ltd. P'ship v. Edwards*, 581 S.E.2d 496, 505-06 (S.C. Ct. App. 2003).

Having found that no fiduciary relationship existed between CIB and Conseco Medical, CIB's claim for breach of fiduciary duty is dismissed.

However, as stated above, "a duty of disclosure and due care can exist in economic transactions where no fiduciary relationship exists." Hubbard & Felix, *supra*, at 72. Thus, even though Conseco Medical did not owe a fiduciary duty to CIB, the facts of this case support the finding that a duty of disclosure and due care existed between the parties.

### Defendant Conseco Medical Insurance Company's<br>*Daubert* Motion to Exclude Testimony of Plaintiffs' Expert,<br>Dr. Charles Alford

Relying upon the provisions of Federal Rule of Evidence 702 regarding the admissibility of expert testimony, and the principles of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), Conseco Medical filed a *Daubert* Motion to Exclude the Expert Testimony of Dr. Charles Alford. Dr. Alford was retained as CIB's expert economist to testify at trial with respect to the damages CIB suffered in the form of lost commissions or lost profits. Specifically, Alford gave an opinion stating the amount of individual major medical commissions CIB would have been reasonably likely to earn in the future from its field force had the alleged wrongs not occurred. Alford's opinion was based on CIB's established historical production of commissions through Conseco Medical.

Conseco Medical argues that Alford's testimony should be excluded because: 1) he has never worked in the insurance industry; 2) he has never written articles on either the insurance

27

industry or business valuations; 3) he has never investigated the volatility level of the individual major medical market; 4) his report is based on numerous unverified representations of CIB; 5) his report did not take into consideration the termination provision in the contract between Conseco Medical and CIB; therefore, his report calculating future profits is merely conjecture; 6) his report makes incorrect assumptions regarding Conseco Medical's right of first refusal; 7) his report fails to take into account CIB's incremental expenses, such as rent and postage; and 8) his report did not take into consideration James English's age and possible retirement.

CIB argues that Conseco Medical's *Daubert* Motion is merely a repetition of its Summary Judgment argument - that it cannot be liable for fraud because the contract between the parties allowed it to non-renew the block of individual major medical policies in North and South Carolina.

Where prospective profits are prevented by the tortious conduct of a defendant, the plaintiff may recover upon proof that it is reasonably certain that such profits would have been realized but for the tort, and they can be calculated from the evidence produced with reasonable certainty. *Petty*, 342 S.E.2d at 615.  Reasonable certainty means only that the damages may not be based on "speculation and conjecture." *Id.*  Any difficulty in proving damages for loss of profits in a tort action does not prevent recovery so long as the plaintiff "can present evidence from which the court can make a 'fair and reasonable approximation of them.'" *Id.*  Proof of lost future profits may be established through expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and comparison with profit performance of businesses similar in size. *Global Protection Corp v. Halbersberg*, 503 S.E.2d 483, 487 (S.C. Ct. App. 1998).  Thus, Alford's expert testimony regarding CIB's lost profits based on an analysis of

business records and historical data is relevant to this case.

Federal Rule of Civil Procedure 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The Advisory Committee Notes to Rule 702 make clear that "[s]ubpart (1) of Rule 702 calls for a quantitative rather than a qualitative analysis. The amendment thus requires that expert testimony be based on sufficient underlying 'facts or data.'"

*Daubert* assigns the trial judge with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 U.S. at 597. *Kumho Tire Co., Ltd. v. Carmichael*, expanded the trial judge's "gatekeeping" function from scientific evidence to all expert testimony. 526 U.S. 137 (1999). In *Daubert*, the Supreme Court announced five factors that may be used in assessing the relevancy and reliability of expert testimony: (1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community. *Daubert*, 509 U.S. at 593-94. This is not an exclusive list of factors and the court's analysis under *Daubert* should be a flexible one. *See Kumho Tire*, 526 U.S. at 141-42 (concluding that testing of reliability should be

flexible and that *Daubert's* five factors neither necessarily nor exclusively apply to every expert). The court's focus in determining whether expert testimony is relevant and reliable must be based "solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

With regard to Conseco Medical's argument that Alford is inexperienced in the field of insurance, CIB argues that Alford has done valuations of closely held corporations such as CIB, has previously been qualified as an expert in cases involving insurance agent commissions, and has been previously qualified as an expert in cases requiring the review of insurance commission statements. In addition, Alford was on the faculty at Furman University for 32 years and was the Chair of the Dept. of Economics. While Alford testified in his deposition that he had not had any other cases "like this one," Conseco Medical has not demonstrated that the projection of future first year and renewal commission revenue for CIB in this case requires any fundamentally different economic methodology from other loss of commissions case.

Conseco Medical does not challenge Alford's credentials or experience as an economist. Conseco Medical also does not challenge the economic methodology used by Alford for projecting lost future commissions based on historical economic data. Conseco Medical primarily challenges the credibility and accuracy of the data on which Alford based his opinion. Specifically, Conseco Medical challenges the accuracy of CIB's regular monthly and yearly financial statements and the factual testimony provided by James and Ronald English. Conseco Medical's objections to Alford's testimony go more to the weight of the evidence than admissibility. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of challenging expert evidence. *Daubert*, 509 U.S. at 595. Thus, "[w]hen

30

facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment [to Rule 702] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts or the other." Advisory Committee Notes, Federal Rule of Evidence 702 (2000 Amendments). For these reasons, Conseco Medical's objections to the accuracy and reliability of the underlying facts and data upon which Alford relied concern the weight of the evidence rather than its admissibility.

Conseco Medical argues that because Alford's report did not take into consideration the termination provision in the contract between Conseco Medical and CIB, his report calculating future profits is merely conjecture. In support of that proposition, Conseco Medical cites two cases *Sun Ins. Mktg. Network v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239 (M.D. Fla. 2003) (stating that "when an agreement contains contingencies that could have plausibly caused termination of the agreement, and termination could affect duration of the business, lost profits estimates have been found too speculative") and *Call Carl, Inc. v. BP Oil Corp.*, 554 F.2d 623 (4th Cir. 1977) (stating that lost profit damages are not available when they are based on an oral expectancy that is contrary to the parties' written contract).

CIB argues that *AIG Life* is distinguishable because in *AIG Life* the court found that the lost profits projection was too speculative because it was based upon a projection of future sales of a certain product when in fact the product was withdrawn from the market, and thus that the assumptions underlying the damages projection was invalid. The court also found that any projection that the policy in question or any similar policy would have been sold under the existing contract after its termination under the same "terms, conditions, profit margins and sales penetration

. . . is pure speculation." CIB points out that the facts presented by this case are different. In this case, Alford's opinion did not project the future loss of commission revenue from a defendant, as the plaintiffs attempted in *AIG Life*. Rather, Alford used CIB's historical record of revenue from the defendant to project the future loss of commission revenue from other insurance carriers.[4] While Alford's projections use the historical data that reflected CIB's past relationship with Conseco Medical and not other insurance carriers, that was due to the fact that such historical data was the only data available. Even though commissions or revenue from other insurance carriers may vary from the commissions or revenue CIB earned with Conseco Medical, this goes to the weight of the evidence and not the admissibility. Certainly it is fodder for cross-examination of the expert. *See Daubert*, 509 U.S. at 595.

The alleged consequential damages suffered by CIB were caused by fraudulent conduct, not by any breach of contract. The alleged misrepresentations and concealment that comprise the fraudulent conduct occurred prior to any termination of CIB's Conseco Medical contracts, and deprived CIB of any adequate opportunity to obtain an alternate carrier agreement for individual major medical polices for itself and its agent corps, and thus to replace its existing book of business before it was replaced by other agencies.

In *Call Carl*, the plaintiffs were service station owners who were notified that their franchise agreements were not going to be renewed, an action which was provided for in their

---

[4] Alford's report stated that according to James and Ronald English, in late 2000 CIB became concerned as to whether Conseco Medical would continue in the health insurance market and asked Conseco Medical for permission to arrange for alternate supply sources of individual major medical policies in the event of Conseco Medical's failure or departure from the market. According to James and Ronald English, Conseco Medical refused to allow them to arrange for such alternative supply sources, insisting that CIB continue with the exclusive arrangement specified in the FMO guidelines.

contracts. The service station owners sued for breach of contract and fraudulent misrepresentation claiming that BP had assured them that their franchise agreements would continue. The service station owners claimed they were entitled to damages for lost future profits. The Fourth Circuit stated that "damages for loss of an expectancy of profits created by prior or contemporaneous oral representations plainly contradictory with the terms of a written contract we believe to be non-recoverable if written contracts are to retain significance." *Call Carl*, 554 F.2d at 630. That case is also distinguishable from the present case. In *Call Carl*, the plaintiffs sought damages for lost profits they would have received from the defendants if the defendants had renewed the plaintiffs' contracts. *Id*. at 629-30. In the current case, CIB seeks damages for lost profits they would have received from other insurance carriers if Conseco Medical had not committed the alleged fraud. Thus, CIB's damages are based on its reliance on Conseco Medical's alleged misrepresentations, not on a loss of an expectation of profits from Conseco Medical.

Conseco Medical's *Daubert* Motion challenges the quality of the data on which Alford relied in reaching his opinion. Conseco Medical does not challenge Alford's qualifications as an economist or the underlying methodology he used in calculating CIB's lost profits. Conseco Medical's objections to Alford's testimony are proper areas for cross-examination. Conseco Medical's objections are not, however, in the opinion of the court, sufficient bases to exclude his testimony. This court concludes that the requirements of Federal Rule of Evidence 702 and *Daubert* are satisfied. Under Rule 702 and *Daubert*, Alford's testimony is sufficiently relevant and reliable. Therefore, Conseco Medical's *Daubert* Motion to Exclude the Testimony of CIB's Expert, Charles Alford, is denied.

## Conclusion

Viewing the evidence in the light most favorable to CIB, genuine issues of material fact exist as to CIB's fraud and negligent misrepresentation claims.  CIB's breach of fiduciary duty claim must fail because no fiduciary relationship existed between CIB and Conseco Medical.  As such, Conseco Medical's Motion for Summary Judgment is **GRANTED** as to CIB's breach of fiduciary duty claim and **DENIED** as to CIB's fraud and negligent misrepresentation claims.  With regard to Conseco Medical's *Daubert* Motion to Exclude Testimony of CIB's Expert, Dr. Charles Alford, the court finds that Dr. Charles Alford's testimony is admissible under Federal Rule of Evidence 702 and *Daubert*.  Therefore, Conseco Medical's *Daubert* Motion to Exclude Testimony of CIB's Expert is **DENIED**.  Because the parties have filed a Joint Stipulation dismissing with prejudice the claims of Plaintiff Ronald English, his claims against Conseco Medical are **DISMISSED** with prejudice.

       **AND IT IS SO ORDERED.**

                                       s/R. Bryan Harwell
                                       R. Bryan Harwell
                                     United States District Judge

November 27, 2006
Florence, S.C.